IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL R. SEROWSKI, | ) | Case No. 1:19-cv-2761 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Paul Serowski, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 14; ECF Doc. 15.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Serowski's application for DIB must be AFFIRMED.

## II.    Procedural History

On March 28, 2017, Serowski applied for DIB.  (Tr. 211-12).  Serowski alleged that he became disabled on October 10, 2016, due to "implantable cardioverter defibrillator in place, chronic combined systolic and diastolic CHF, enlargement of the heart, cardiomyopathies, dizziness, insomnia, left sided ulcerative colitis, inflammatory bowel disease, ulcer, irregular

heartbeat, fast heartbeat, heart failure."  (Tr. 245).  The Social Security Administration denied the claim initially and upon reconsideration.  (Tr. 91-116).  Serowski requested an administrative hearing.  (Tr. 134-35).  ALJ Catherine Ma held the administrative hearing on August 29, 2018 and denied the claim in a December 4, 2018 decision.  (Tr. 9-90).  On September 26, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-8).  On November 22, 2019, Serowski filed a complaint to obtain judicial review.  ECF Doc. 1.

**III.    Evidence**

**A.    Personal, Educational, and Vocational Evidence**

Serowski was born on February 26, 1964, and he was 52 years old on the alleged onset date.  (Tr. 211).  Serowski had a high school education, and he had taken some business classes at community college.  (Tr. 40-41).  He also had prior work experience as an automotive service writer and service department manager.  (Tr. 74).

**B.    Relevant Medical Evidence**

Serowski was initially diagnosed with heart failure in 2009 after he had a dilated cardiomyopathy and testing showed an ejection fraction of 20%.  (Tr. 320).  He had an ICD pacemaker inserted, and from 2010 through 2015 his exercise capacity and health were excellent.  (Tr. 320).  On May 18, 2015, Serowski's ICD was extracted due to a fractured lead, and he had an elective dual-chamber ICD placement by Mohammad Hajjiri, MD on June 3, 2015.  (Tr. 404).  On June 4, 2015, an x-ray showed that Serowski was negative for any acute cardiopulmonary disease.  (Tr. 512).

On October 23, 2015, Serowski told Dr. Hajjiri that he had swelling in his arm and felt worse after he took a shower.  (Tr. 424).  Examination showed clear lungs, normal heart sounds,

and no lower extremity edema.  (Tr. 425).  Dr. Hajjiri diagnosed Serowski with acute chronic mixed systolic and diastolic heart failure, possible sarcoid, palpitations with evidence of supraventricular tachycardia, and atrial flutter/atrial fibrillation.  (Tr. 426).  Dr. Hajjiri also noted that Serowski had deep vein thrombosis in his upper extremity that had improved with medication.  (Tr. 426).  On January 13, 2016, Dr. Hajjiri performed a bidirectional block procedure and noted that Serowski tolerated the procedure well.  (Tr. 403-04).  Anesthesiologist Tejbir Sidhu, MD, noted that Serowski had an abnormal heart rhythm, normal pulmonary exam, and clear chest.  (Tr. 416).  On January 29, 2016, Serowski told Dr. Hajjiri that he was doing well, felt much better, and had no rapid heart rates.  (Tr. 395).  Examination showed clear lungs and no edema.  (Tr. 396).  On April 5, 2016, Serowski told Dr. Hajjiri that he was doing well but had some palpitations.  (Tr. 388).  Serowski told Dr. Hajjiri that he wanted to exercise, and Dr. Hajjiri approved exercise that was not strenuous.  (Tr. 390).

On January 5, 2016, Serowski told Charlotte Barkett, RN, that he had started exercising for weight control the day before his visit.  (Tr. 418).  Serowski said that climbing stairs made him more tired, but he was able to use a treadmill for 30 minutes.  (Tr. 418).  On examination, Mark Dunlap, MD, noted that Serowski had regular heart rate and rhythm, clear lungs, no lower extremity edema, and generally "look[ed] great."  (Tr. 418).  Dr. Dunlap noted that from September 2009 through August 2015, testing showed a left ventricular ejection rate between 35% and 40%.  (Tr. 419).  Dr. Dunlap continued Serowski's medications and recommended an SVT ablation.  (Tr. 420).

On January 14, 2016, Rocco Ciocca, MD, noted that imaging showed no evidence of deep vein thrombosis in his right or left extremities.  (Tr. 403, 414).  On examination, Serowski had regular heart rate and rhythm, comfortable breathing, warm and well-perfused extremities

3

with no edema, and full strength bilaterally.  (Tr. 412).  Dr. Ciocca continued Serowski's medications.  T(r. 415.

On January 19, 2016, Christopher Suntala, MD, noted that Serowski had a partially successful ablation procedure, which ablated his supraventricular rhythm but did not uncover the source of his ventricular tachycardia.  (Tr. 396).  Serowski said that he'd had head congestion since the procedure.  (Tr. 396).  On examination, Serowski had normal lungs, regular heart rate and rhythm, and normal extremities without edema.  (Tr. 398).

On February 8, 2016, Jeffrey Galvin, MD, noted that Serowski's diagnoses included hyperlipidemia, peptic ulcer disease, dilated cardiomyopathy, chronic combined systolic and diastolic chronic heart failure class 3, ventricular tachycardia, supraventricular tachycardia, dizziness, chronic maxillary sinusitis, periapical abscess, hypertriglyceridemia, and ulcerative colitis.  (Tr. 392).  Dr. Galvin noted that Serowski had regular heart rate and rhythm, mild split first heart sound without obvious gallop, clear lungs, no edema or other symptoms in his extremities, and normal bowel sounds.  (Tr. 394).

On March 22, 2016, Debra Gerding, RN, noted that no events had been recorded on Serowski's monitoring device since January 12, 2016.  (Tr. 390).  On March 28, 2017, Gerding noted that, despite Serowski's reports of heart palpitations and skipped beats, his ICD had not recorded any such events.  (Tr. 515, 575).  Gerding noted that Serowski's ICD had a stable battery and leads.  (Tr. 515, 575).

On July 5, 2016, Serowski told Nurse Barkett that he didn't think his ablation worked.  (Tr. 383).  Serowski reported having more shortness of breath with activity and walking and gradually increasing fatigue. (Tr. 383).  On examination, Dr. Dunlap found that Serowski had regular heart rate and rhythm, clear lungs, and no lower extremity edema.  (Tr. 385).  Dr. Dunlap

noted that Serowski had a left ventricular ejection fraction ranging from 35% to 40%.  (Tr. 386).
Dr. Dunlap noted that, during a 30-day monitoring period, Serowski had frequent premature
ventricle contractions, one ventricular tachycardia episode, and symptoms of palpitations and
dizziness or racing heart rate.  (Tr. 386).  Dr. Dunlap diagnosed Serowski with heart failure with
reduced ejection fraction, systolic heart failure, supraventricular tachycardia, ventricular
tachycardia, chronic combined systolic and diastolic chronic heart failure class 3, dilated
cardiomyopathy, and hyperlipidemia.  (Tr. 386-87).

On September 13, 2016, Dr. Hajjiri found that Serowski had no significant heart
murmurs, clear lungs, no edema, and intact pulses.  (Tr. 377).  Dr. Hajjiri noted that Serowski
had a left ventricle ejection fraction of 35%.  (Tr. 378).  On September 21, 2016, Dr. Hajjiri
performed a diagnostic EP study and loop record implantation.  (Tr. 370).  Dr. Hajjiri noted that
Serowski had frequent palpitations with no episodes detected on device interrogations.  (Tr. 370).
Dr. Hajjiri determined that Serowski had induction of sustained right bundle branch block
morphology ventricular tachycardia, multiple morphology premature ventricle contractions, left
bundle branch block, and inferior axis.  (Tr. 371).  Dr. Hajjiri prescribe mexiletine and noted that
ventricular tachycardia ablation might have been considered at a later date.  (Tr. 371).  On
October 25, 2016, Dr. Hajjiri noted that Serowski reported dyspnea on exertion, inability to do
pervious activities, and unintentionally lost weight.  (Tr. 361).  On examination, Serowski had no
significant heart murmurs, rubs, or thrills; clear lungs; no lower extremity edema; and intact
pulses.  (Tr. 363).

On October 11, 2016, Nurse Barkett noted that Serowski denied having heart symptoms
except when he had walked for a while and that he reduced his activity to "nothing strenuous."
(Tr. 366).  On examination, Dr. Dunlap found that Serowski had regular heart rate and rhythm,

clear lungs, and no lower extremity edema.  (Tr. 367).  Dr. Dunlap noted that Serowski had a left ventricular ejection fraction ranging from 35% to 40%.  (Tr. 368).  Dr. Dunlap noted that Serowski was diagnosed with "cardiology problems," including systolic heart failure, supraventricular tachycardia, ventricular tachycardia, chronic combined systolic and diastolic chronic heart failure class 3, dilated cardiomyopathy, and hyperlipidemia.  (Tr. 368-69).  Dr. Dunlap continued Serowski's medications.  (Tr. 369).

On October 31, 2016, Serowski told Charlotte Barkett, RN, that he felt terrible and that he had good and bad days with his breathing.  (Tr. 357).  On examination, Serowski had minor palpitations, normal lungs, and no lower extremity edema.  (Tr. 359).  Barkett noted that Serowski had a left ventricular ejection fraction ranging from 35% to 40%.  (Tr. 360).

Also, on October 31, 2016, Serowski told Adam Ingram, PharmD, that he felt much better symptomatically, and that he'd been washing his car.  (Tr. 333, 355-56).

On November 9, 2016, Najmul Siddiqi, MD, noted that Serowski had a left ventricular ejection fraction of 35% with unknown etiology.  (Tr. 352).  He noted that Serowski complained of shortness of breath and atypical chest pain.  (Tr. 352).  On examination, Serowski had a normal apex heartbeat, regular heart sounds, no pitting edema, and full peripheral pulses.  (Tr. 353).  Dr. Siddiqi determined that Serowski had no significant coronary disease, normal filling pressures, and normal cardiac output.  (Tr. 355).

On November 9, 2016, Sanjay Gandhi, MD, completed an invasive cardiology report, indicating that Serowski had normal filling pressure, normal cardiac output, no significant obstructive artery disease, and sluggish flow in his arteries.  (Tr. 349).  Dr. Gandhi placed catheters in Serowski's right radial artery and ascending aorta.  (Tr. 351).

On November 17, 2016, Mahi Ashwath, MD, administered an exercise stress test.  (Tr. 345).  Dr. Ashwath noted that Serowski had no abnormal ST segment changes, occasional premature ventricle contractions, and no abnormal symptoms.  (Tr. 347).  Dr. Ashwath concluded that the test was indeterminant for ischemia and that Serowski had a good prognosis.  (Tr. 347).

On November 17, 2016, Grace Cater, MD, performed an echocardiogram and found "moderately-severely globally reduced" systolic function in the left ventricle, left ventricular ejection fraction of 35%, normal left and right atria, and normal right ventricle.  (Tr. 344-45).

On December 5, 2016, PT myocardial imaging and PET-CT cardiac imaging showed an enlarged left ventricle, global hypokinesis of the left ventricle with focal wall motion abnormality and left ventricular ejection fraction of 38%.  (Tr. 441-42).  The findings were similar to an August 10, 2015 study.  (Tr. 442).

On December 13, 2016, Serowski told Lisa Lanzara, CNP, that he'd had racing heart rates that woke him up in the middle of the night, an episode of dizziness and palpitations that made him feel like he would pass out, and shortness of breath with normal activity.  (Tr. 336).  Examination showed regular heart rate and rhythm without murmurs, normal extremities, no edema, full radial pulse, and 2 out of 4 dorsalis pedis pulse.  (Tr. 338-39).  He had a left ventricle ejection fraction of 38%.  (Tr. 340).  Lanzara noted that a June 4, 2015 x-ray showed no significant interval change in Serowski's chest, normal cardiomediastinal silhouette, no acute infiltrates, and unchanged dual lead cardiac pacemaker.  (Tr. 340).  Lanzara noted that testing and imaging from December 5 and 8, 2016, ruled out cardiac sarcoidosis and said that the findings suggested cardiomyopathy.  (Tr. 340).

On December 13, 2016, Megan Valente, RPH, noted that Serowski had a regular heart rate and rhythm, normal and clear lungs, and no lower extremity edema.  (Tr. 334).  Valente noted that Serowski had an ejection fraction ranging from 35% to 40%.  (Tr. 335).  Valente noted that Serowski took trazodone for his insomnia and recommended that it be discontinued because it did not help and increased risk for prolonged QT intervals.  (Tr. 336).  On December 19, 2016, Serowski told Valente that he was feeling well, but his newer insomnia medication was not helping him as much as trazodone had.  (Tr. 329).  He also said that he noticed a diuretic effect with his sacubitril/valsartan.  (Tr. 329).  Valente noted that Serowski had an ejection fraction ranging from 35% to 40%.  (Tr. 330).  Valente increased Serowski's sacubitril/valsartan prescription and advised him to continue monitoring his blood pressure.  (Tr. 331).

On December 21, 2016, Serowski told Dr. Galvin that he had shortness of breath with heavy exercise, trouble breathing while lying flat, palpitations, and dyspnea.  (Tr. 326).  Dr. Galvin noted that Serowski's ejection fraction had not improved dramatically despite aggressive therapy and recommended that he scale back aggressive physical exertion.  (Tr. 326).  Dr. Galvin also noted that Serowski's blood pressure was in "good control" and that he had "done better since switching off the lisinopril on to Enestro."  (Tr. 324).  On examination, Serowski had regular heart rate and rhythm without murmur, clear lungs, and no tremor, edema, or warmth in his extremities.  (Tr. 327).  Dr. Galvin prescribed mirtazapine for Serowski's insomnia and continued his heart medications.  (Tr. 327).

On December 27, 2016, Prashanth Muthukrishnan, MD, saw Serowski for a pulmonary evaluation due to shortness of breath on exertion since Summer 2016.  (Tr. 320).  Dr. Muthukrishnan noted that Serowski reported "doing better" with his heart medication, but he continued having shortness of breath and was not able to reach maximal heart rate during a

cardiac stress test.  (Tr. 320).  Dr. Muthukrishnan noted that Serowski had insomnia, which was

a side-effect of one of his medications (mexitil).  (Tr. 321).  On examination, Serowski was in no

acute distress, was cooperative, had a regular heart rate and rhythm, had no lower extremity

edema, was alert and oriented, and had clear lungs.  (Tr. 322).  Dr. Muthukrishnan diagnosed

Serowski with dyspnea on exertion, insomnia, and dilated cardiomyopathy.  (Tr. 322).  He

ordered a pulmonary function test to rule out pulmonary etiology.  (Tr. 322).  On February 21,

2017, Prashanth Muthukrishnan, MD, noted that Serowski had stable ventricular tachycardia

controlled with medication, was allowed to exercise by his arrhythmia specialist, and reported

feeling "slightly better" after he had started walking regularly.  (Tr. 309).  On examination,

Serowski was in no acute distress, was cooperative, had a regular heart rate and rhythm, had no

lower extremity edema, was alert and oriented, and had a normal pulmonary function test.  (Tr.

311).  Dr. Muthukrishnan diagnosed Serowski with dyspnea on exertion, insomnia, and dilated

cardiomyopathy.  (Tr. 311).  Dr. Muthukrishnan noted that Serowski's poor exercise tolerance

and fatigue could be side effects from his medications, and there was "no pulmonary disease to

be concerned about."  (Tr. 311).

On January 11, 2017, Serowski saw Khalil Murad, MD, for a heart failure clinic follow

up.  (Tr. 317).  Dr. Murad noted that Serowski was diagnosed with ulcerative colitis, high

cholesterol, heart failure with reduced ejection fraction, an implanted cardiac defibrillator, and

deep vein thrombosis in his left arm.  (Tr. 317).  Dr. Murad noted that Serowski's heart

symptoms were not worsening and that he reported feeling well.  (Tr. 317).  Examination showed

a regular heart rate and rhythm, clear lungs, and no lower extremity edema.  (Tr. 317).

Serowski's left ventricular ejection fraction was 35%.  (Tr. 318).  Dr. Murad increased

Serowski's spironolactone prescription, contingent upon his potassium levels.  (Tr. 319).

On January 11, 2017, Edward Sivak, MD, conducted a pulmonary function test, which showed that Serowski had normal pulmonary function.  (Tr. 315-16).

On February 27, 2017  Nurse Lanzara noted that a Holter monitor test was within normal limits.  (Tr. 309).  On March 28, 2017, Serowski told Lanzara that he continued to feel tired, had daily palpitations, had progressively worse shortness of breath, had not exercised, and had positional dizziness day to day.  (Tr. 509, 567).  Serowski denied any leg swelling.  (Tr. 509, 567).  Lanzara noted that August 2015 and November 2016 testing had shown a left ventricular ejection fraction of 35%, and December 2016 testing had shown a left ventricular ejection fraction of 38%.  (Tr. 509, 512-13, 567, 572-73).  On examination, Serowski had a normal appearance, regular heart rate and rhythm, clear lungs, normal extremities with no edema, full radial pulse, and 2 out of 4 dorsalis pedis pulse.  (Tr. 511, 567, 570-71).  The results from his stress test were within normal limits.  (Tr. 514, 575).  Lanzara discontinued Serowski's mexiletine prescription and added Amiodarone.  (Tr. 514, 575).

On April 18, 2017, Serowski told Dr. Dunlap that his palpitations had decreased, but felt more intense when they occurred.  (Tr. 530, 554).  He denied having daytime sleepiness but said that he felt tired often.  (Tr. 530, 554).  Examination showed a regular heart rate and rhythm, clear lungs, and no lower extremity edema.  (Tr. 530, 554).  Dr. Dunlap noted that testing between January 2015 and November 2016 showed a left ventricular ejection fraction of 35% to 40%.  (Tr. 531, 555).  Dr. Dunlap adjusted Serowski's medications, recommended cardiac rehab, and educated Serowski on the risks and benefits of exercise.  (Tr. 532, 556).

On May 9, 2017, Dr. Hajjiri noted that Amiodarone appeared to help Serowski's symptoms, that he would benefit from cardiac rehab, and that he would need to refrain from any strenuous activities or stress.  (Tr. 551).  On June 1, 2017, Serowski told Dr. Hajjiri that he

would have palpitations 12 times per day despite taking Amiodarone.  (Tr. 543).  Examination showed no significant heart murmurs, rubs, or thrills; clear lungs; no lower extremity edema; and intact pulses.  (Tr. 546).  Dr. Hajjiri stopped Serowski's Amiodarone prescription and restarted mexiletine.  (Tr. 548).  On June 13, 2017, Serowski told Dr. Hajjiri that he continued to feel tired.  (Tr. 755).  Examination showed no significant heart murmurs, rubs, or thrills; clear lungs; no lower extremity edema; and intact pulses.  (Tr. 759).  Serowski had a normal liver function test and pulmonary function test.  (Tr. 761).  Dr. Hajjiri again switched Serowski to Amiodarone and cancelled his mexiletine.  (Tr. 761). On July 18, 2017, Serowski told Dr. Hajjiri that he had worsening fatigue and depression.  (Tr. 854).  Examination showed no significant heart murmurs, rubs, or thrills; clear lungs; no lower extremity edema; and intact pulses.  (Tr. 858). Serowski had a normal liver function test and pulmonary function test.  (Tr. 860). Dr. Hajjiri continued Serowski's Amiodarone.  (Tr. 860).

On June 1, 2017, Edward Warren, MD, conducted a pulmonary function test with "essentially normal findings."  (Tr. 550).

On August 23, 2017, Ohad Ziv, MD, noted that Serowski reported more dyspnea on exertion, more fatigue, some palpitations, and improvement with Amiodarone.  (Tr. 906). Examination showed regular heart rhythm, normal point of maximal impulse, normal carotid upstroke, no arrhythmias, no edema in the extremities, normal movement in all extremities, and normal muscle tone.  (Tr. 909).  Dr. Ziv ordered a cardiopulmonary stress test for further evaluation of Serowski's cardiac output limitations.  (Tr. 909).  Dr. Ziv also recommended that Serowski slowly increase his activity.  (Tr. 910).

On September 21, 2017, Yasir Tarabichi, MD, and Fuad Aleskerov, MD, noted that Serowski's EKG results were normal before exercise and after maximal exercise.  (Tr. 673, 675-

76, 924).  Dr. Aleskerov noted that the results made "significant cardiac insufficiency or limitation less likely."  (Tr. 674, 926).  Dr. Aleskerov stated that "it does not seem that [Serowski] has heart or lung defect[s] limiting his exertion to lower than normal," but his respiratory system was not able to accommodate stress to the same high intensity as his cardiovascular system.  (Tr. 677).  Dr. Aleskerov recommended cardiovascular exercise to improve conditioning.  (Tr. 677).

On October 17, 2017, Nurse Barkett noted that Serowski's ventricular tachycardia was controlled with medication.  (Tr. 963).  Serowski reported that he had worse shortness of breath, felt more tired, had trouble slowing himself down, and had a dizzy spell during which he felt like he would fall or pass out.  (Tr. 964).  Serowski also reported feeling his heart flutter, and a pacemaker check showed one episode of supraventricular tachycardia.  (Tr. 964).

On October 17, 2017, examination by Dr. Murad showed a regular heart rate and rhythm, clear lungs, and no lower extremity edema.  (Tr. 965).  Dr. Murad also noted that pulmonary function tests and cardiopulmonary exercise tests yielded normal results.  (Tr. 966-67).  Dr. Murad adjusted Serowski's medications and recommended a low sodium diet.  (Tr. 969).  On February 9, 2018, Serowski told Dr. Murad that he'd had two 30-second episodes of palpitations, that his dyspnea on exertion was worse but variable, and that he had a progressive walking problem.  (Tr. 706, 710, 1067).  Dr. Murad noted that Serowski's ventricular tachycardia was controlled with medication.  (Tr. 706, 1067).  Examination showed a regular heart rate and rhythm, clear lungs, and no lower extremity edema.  (Tr. 707, 1068).  Dr. Murad ordered an ICD check, adjusted Serowski's medications, and recommended a low sodium diet.  (Tr. 709, 1070-71).

On February 9, 2018, Shawna Eccleston, RN, noted that Serowski's ventricular tachycardia was controlled with medication, but he reported several episodes of palpitations and said that his dyspnea had been "a little worse." (Tr. 1067).

On February 26, 2018, Jeffrey Galvin, MD, noted that Serowski's heart failure was "under satisfactory control" with medication, but he had some uncontrollable epistaxis (nosebleed) as a side effect of his medication. (Tr. 710, 1086). Examination showed regular heart rate and rhythm, clear lungs, no edema, normal bowel sounds, and normal pulses. (Tr. 712, 1089).

On April 16, 2018, Serowski told Nurse Lanzara that he continued to have daily palpitations, but his palpitations had improved. (Tr. 1116). He said that he had shortness of breath when using stairs, he did not exercise, and he had positional dizziness. (Tr. 1116). Serowski denied having any leg swelling, chest pain, or extra fluid. (Tr. 1116). Examination showed regular heart rate and rhythm, clear lungs, normal extremities, no inflammation, no edema, full radial pulse, and 2 out of 4 dorsalis pedis pulse. (Tr. 1121). Lanzara reduced Serowski's Amiodarone dosage. (Tr. 1125).

On May 8, 2018, Tara Nagaraj, Pharm. D., noted that Serowski had had a left ventricular ejection fraction of 35% in August 2017. (Tr. 1155).

Also, on May 8, 2018, Michelle Colon, RN, noted that Serowski's ventricular tachycardia was controlled with medication and he had a normal pulmonary function test. (Tr. 1157). Serowski told Colon that he had worsening fatigue and increasing weight. (Tr. 1158). Examination showed regular heart rate and rhythm, clear lungs, and no lower extremity edema. (Tr. 1159). Colon continued Serowski's medications as prescribed and directed him to follow up with Dr. Murad. (Tr. 1162).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician Opinion – Mohammad Hajjiri, MD

On May 18, 2017, Dr. Hajjiri completed a "cardiac residual functional capacity questionnaire." (Tr. 535-38). Dr. Hajjiri stated that Serowski's dilated cardiomyopathy was stable, but he needed medication adjustment for his ventricular tachycardia. (Tr. 535). Dr. Hajjiri noted that Serowski's symptoms included shortness of breath, palpitations, and dizziness. (Tr. 535). He said that Serowski would have marked limitations in physical activity, "good days" and "bad days," and a need for three absences from work per month. (Tr. 536). Dr. Hajjiri opined that Serowski's symptoms were "somewhat increased" by stress, and that he was able to work low stress jobs. (Tr. 537). He also said that Serowski's cardiac condition would cause depression and chronic anxiety and would occasionally interfere with his attention and concentration needed to perform even simple work tasks. (Tr. 537). Serowski could sit, stand, and walk for less than two hours each in an 8-hour workday; did not require changing positions at will; and would need a 15 to 20-minute break every hour. (Tr. 538). Dr. Hajjiri also said that Serowski would need to raise his legs to heart level for half the workday. (Tr. 538). Serowski could never lift over 20 pounds and could rarely lift 10 pounds. (Tr. 538). He could occasionally twist, stoop, crouch, squat, and climb stairs; but he could never climb ladders. (Tr. 538).

### 2. Treating Physician Opinion – Khalil Murad, MD

On July 27, 2018, Dr. Murad completed a medical source statement, in which he stated that he had reviewed Dr. Hajjiri's opinion and agreed with the limitations assessed in it. (Tr. 1199). Dr. Murad stated, "[h]eart failure is a progressive disease and expected to continue to limit [Serowski's] ability to carry on physical activities." (Tr. 1199).

### 3. Medical Consultant Opinion – James Greco, MD

On March 22, 2018, medical consultant James Greco, MD, completed a "physical residual functional capacity assessment." (Tr. 558-65). Dr. Greco opined that Serowski could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for at least 2 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and push and/or pull without limitation. (Tr. 559). He could frequently climb ramps, climb stairs, and balance; occasionally stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (Tr. 560). Dr. Greco said that Serowski needed to avoid concentrated exposure to hazards such as machinery and heights due to uncontrolled palpitations, dizziness, and light-headedness. (Tr. 562).

### 4. State Agency Consultants' Opinions

On April 16, 2017, state agency consultant Lynne Torello, MD, assessed Serowski's physical RFC based on a review of his medical records. (Tr. 98-102). Dr. Torello determined that Serowski could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push and/or pull without limitation. (Tr. 98). Serowski could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; frequently balance; and never climb ladders, ropes, or scaffolds. (Tr. 99). He needed to avoid concentrated exposure to extreme heat and cold and avoid all exposure to hazards such as machinery and heights. (Tr. 99). Dr. Torello opined that

Serowski was able to perform light work and that he could return to his past work as an automobile repair service estimator.  (Tr. 100-02).  On June 16, 2017, Steve E. McKee, MD, concurred with Dr. Torello's opinion.  (Tr. 110-14).

### D. Relevant Testimonial Evidence

Serowski testified at the ALJ hearing.  (Tr. 37-72).  Serowski said that he had trouble climbing to the top of the stairs, but that he did "a fair amount of going up and down the stairs" in his home to dress and bathe his 5-year-old grandson, whose room was on the second floor. (Tr. 38, 59, 62).  When he climbed stairs, he could make it halfway before he would have to take a break to catch his breath.  (Tr. 59).  He also had four dogs, which he fed and cleaned up after. (Tr. 39-40, 58).  He was able to drive without restrictions, but he once pulled over and had his wife drive because he felt like he was going to pass out.  (Tr. 41, 67).  He had to take breaks and lie down when vacuuming.  (Tr. 59).  His chores also included cleaning the toilet, wiping down the sink, and sweeping the bathroom.  (Tr. 60).  He could not lift a laundry basket, but he tried to help out by dragging it.  (Tr. 60).  He went to the grocery store with his wife sometimes, but he had trouble walking.  (Tr. 60).  Serowski said that he weighed himself daily and tried to limit his diet to 2,000 milligrams of sodium per day.  (Tr. 64).  Serowski said that he tried to exercise, but he couldn't walk long distances.  (Tr. 65).

Serowski testified that, from 2016 through the time of the hearing, he worked part-time as a service writer for a car dealership.  (Tr. 41, 44, 52).  Serowski explained that he acted as a liaison between customers and technicians – he would greet customers in the service department driveway, take certain numbers from the vehicle, input the information into the computer, and translate the customer concern into language a technician would better understand.  (Tr. 41-42, 44).  The technician would return to him after the issue was diagnosed, and he would either take

care of any warranty issues or sell the required item or service to the customer.  (Tr. 45).  He would also gather any parts for the technician to replace, drive the car through the car wash, explain the service to the customer, and finish any paperwork.  (Tr. 45).  Serowski said he spent 80% to 90% of the job on his feet, but he had a chair that he tried to sit in as much as he could.  (Tr. 46).  The parts he carried could range from 5 pounds to 40 pounds.  (Tr. 46).  Serowski said that he had worked in the same kind of position for 15 years.  (Tr. 43).  He'd also worked as a service department manager between 2012 and 2014, but he returned to working as a service writer because the stress involved in the supervisory role was too much for him.  (Tr. 47-48).  When he worked as a service department manager, he was on his feet 100% of the workday and would sometimes have to fill in as a service writer.  (Tr. 50-51).

Serowski testified that, in early 2016, Dr. Hajjiri told him to avoid all stressful situations, not lift anything over 10 pounds, and avoid cutting grass or raking leaves because of his tachycardia.  (Tr. 52-53).  At that time, Serowski told his employer that he couldn't work full-time, and his employer allowed him to reduce his schedule to 5 hours per day, gave him additional breaks, and allowed him to use a chair.  (Tr. 53).  He still had to lift because there was no porter staff.  (Tr. 53).  Some days, he would work less if he felt exhausted.  (Tr. 54).  Serowski said that his heart issues made him feel exhausted by noon or 1:00 PM, even if he'd had a full night's rest.  (Tr. 55).  He said that he also got dizzy spells, could feel when his heart was palpitating, and he felt like he would pass out on occasion.  (Tr. 55-56).  He had trouble dealing with the stress when customers took out their frustration on him.  (Tr. 56, 67).  He also felt unable to keep up with the fast pace in the service department.  (Tr. 57).  Serowski also said that his ulcerative colitis flared up every day and medication did not help, so he had several accidents when he could not get to the restroom quickly enough.  (Tr. 57-58).

Serowski testified that medications had severe side effects upon his thyroid function, so he had to have his prescriptions adjusted.  (Tr. 63-64).  His medications for ulcerative colitis also made him susceptible to infections.  (Tr. 69).  He was also given an ICD because his ejection fraction was at 20%.  (Tr. 65).  Serowski said that he once had to have his ICD replaced because it had torn out of his heart when he "over-reached."  (Tr. 65).  He said that he had to be careful when lifting up or out with his left arm, so he would not pull the ICD leads out of his heart again.  (Tr. 66).  Serowski said that he did "fairly well" on his stress tests, except he was not able to complete the latest one due to shortness of breath.  (Tr. 66).  He said that his doctors recommended cardiac rehabilitation, but his insurance didn't cover it.  (Tr. 66).  Serowski also said that he would elevate his legs to heart level for 15 to 30 minutes once or twice a day depending upon how he felt, and he had swelling in his belly and ankles.  (Tr. 70-71).

Sandra Steele, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 73-85).  The ALJ asked the VE whether a hypothetical individual with Serowski's age, experience, and education could work if he was limited to light work, except that:

> This individual can occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl.  This individual can have frequent exposure to extreme heat and extreme cold.  This individual should never be exposed to unprotected heights and dangerous machinery.

(Tr. 75).  The VE said that such an individual could perform Serowski's past work as a service manager and serves writer and could perform other work such as assembler, sorter/packer, and general office helper.  (Tr. 75-77).  If the same individual were limited to sedentary work, the transferrable customer service skills from the previous work would allow the individual to work as an appointment clerk or a telephone sales clerk.  (Tr. 78-79).

If the individual from the second hypothetical were also required to elevate his legs to chest level once during the workday for 15 to 30 minutes, he could perform the same jobs so long as he limited his leg raising to the lunch break.  (Tr. 79-80).  Otherwise, he could not perform any work.  (Tr. 80).  If the individual from the second hypothetical were limited to low-stress jobs – meaning that he could not solve problems, make evaluations, or reach conclusions or that he could not negotiate, arbitrate, resolve conflicts, or interact with the public on a more-than-superficial level – he would not be able to perform the jobs the VE had identified.  (Tr. 80-81).  If the individual identified in the second hypothetical had to elevate his legs half the workday, the VE said that such an individual could not perform the jobs identified.  (Tr. 82). The hypothetical individual also could not work if he were limited to (1) no more than 2 hours sitting and two hours standing/walking; (2) being absent from work three days per month; (3) taking unscheduled 15 to 20 minute breaks every hour; or (4) being preoccupied with his medical condition for a third of the workday.  (Tr. 82-83).  If the individual from the second hypothetical were limited to simple, routine tasks, he could not perform the work identified by the VE.  (Tr. 83-84).

## IV.    The ALJ's Decision

The ALJ's December 4, 2018, decision found that Serowski was not disabled and denied his claim for DIB.  (Tr. 12-20).  The ALJ determined that Serowski had the severe impairments of "chronic heart failure, cardiomyopathy, hyperlipidemia, and ulcerative colitis," but none of his impairments met or equaled a Listing.  (Tr. 14-15).  The ALJ determined that Serowski had the RFC to perform sedentary work, except that he could "occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds.  The claimant can frequently balance, but occasionally stoop, kneel, crouch, and crawl.  The claimant can also have frequent exposure to extreme heat or

19

extreme cold, but never have exposure to unprotected heights and dangerous machinery."  (Tr. 15).

The ALJ stated that, in assessing Serowski's RFC, she "considered all symptoms" in light of the objective medical evidence and other evidence.  (Tr. 15).  The ALJ noted that she was not allowed to "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s)."  (Tr. 17).  She summarized the limitations in Dr. Hajjiri's and Dr. Murad's opinions, but stated that:

> these opinions are not entirely consistent with the claimant's ability as demonstrated by his ability to work part time.  It is also not supported by the record showing few abnormal signs on studies and treatment that controls the claimant's symptoms.  Also despite these providers limiting the claimant, they have not placed any restrictions on his ability to drive.

(Tr. 17).  The ALJ stated that Dr. Greco's opinion was consistent with the record, but it was not entirely supported because he gave little explanation as to how he came to his conclusions.  (Tr. 17).  The ALJ said that Dr. Torello's and Dr. McKee's opinions were not entirely consistent with the record because they had not considered Serowski's ulcerative colitis.  (Tr. 18).  The ALJ stated that her RFC finding was "supported by the objective findings, the claimant's activities of daily living, the medical record, and other evidence of record."  (Tr. 18).

Based on Serowski's RFC and the VE's testimony, the ALJ determined that Serowski was able to perform such representative occupations as "appointment clerk" and "telephone sales clerk."  (Tr. 19).  Accordingly, the ALJ found that Serowski was not disabled from October 10, 2016, through the date of her decision and denied his claim for DIB.  (Tr. 20).

## V.   Law & Analysis

### A.   Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without "interference by the courts."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.")  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to

produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

> ### B.     Step Four: Weighing Medical Opinion Evidence

Serowski argues that the ALJ failed to apply proper legal standards and failed to reach a decision supported by substantial evidence in evaluating Dr. Hajjiri's and Dr. Murad's opinions. ECF Doc. 9 at 15-23.  Serowski asserts that substantial evidence did not support the ALJ's findings that Dr. Hajjiri's and Dr. Murad's opinions were: (1) "not entirely consistent" with Serowski's ability as demonstrated by his ability to work part time; and (2) not supported by the record when there were few abnormal signs on studies, treatment controlled his symptoms, and the opinions did not limit his ability to drive.  ECF Doc. 9 at 18-20 (asserting, among other things, that his part time work was too limited to support a finding that he could work full time and that his ability to drive was not relevant to the limitations).  Serowski also contends that the ALJ failed to apply proper legal standards because – despite not finding Dr. Torello's, Dr. McKee's, or Dr. Greco's opinions any more persuasive than Dr. Hajjiri's and Dr. Murad's – the ALJ did not discuss how he weighed the other regulatory factors beyond consistency and supportability.  ECF Doc. 9 at 21-22.  Further, Serowski argues that the ALJ's error was not harmless because: (1) limiting him to a low stress job in accordance with those opinions would preclude him from working as a clerk or telephone sales clerk; (2) the Medical-Vocational Guidelines would direct a "disabled" finding; and (3) being absent from work for three days a month, taking an unscheduled 15-20 minute break every hour, and elevating his legs while seated several times a day would preclude competitive work.  ECF Doc. 9 at 22-23.

The Commissioner responds that the ALJ adequately explained how he weighed the regulatory factors pursuant to 20 C.F.R. § 404.1520c(b)(2) and that substantial evidence supported the ALJ's conclusion that Dr. Hajjiri's and Dr. Murad's opinions were not consistent with other evidence and not supported.  ECF Doc. 12 at 8-13.  Further, the Commissioner argues that the ALJ adequately considered the whole record and all of Serowski's symptoms, and that Serowski improperly seeks to have this court re-weigh the evidence.  ECF Doc. 12 at 10-11.  The Commissioner also argues that the ALJ was not required to articulate how he weighed other regulatory factors in weighing the medical opinion evidence because: (1) the state agency reviewers' assessments were "prior administrative medical findings" rather than "medical opinions"; and (2) the ALJ did not find that the prior administrative medical findings and Dr. Hajjiri's and Dr. Murad's opinions were equally well-supported and consistent with the record.  ECF Doc. 12 at 10.

Serowski replies that the removal of the "controlling weight" analysis does not excuse the Social Security Administration from following its new regulations by explaining how other factors were weighed after determining that the consistency and supportability of the opinions made them equally persuasive.  ECF Doc. 13 at 2-3.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e).  On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 17, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."

C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. § 404.1520c(a).  In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions.  20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).  Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards in evaluating Dr. Hajjiri's and Dr. Murad's opinions.  The ALJ complied with the regulations when she expressly noted that she was not permitted to give any particular weight or controlling weight to the opinions and specifically articulated that she found the opinions were both inconsistent with other evidence in the record and not supported.  20 C.F.R. § 404.1520c(b)(2); (Tr. 17).  And, because the ALJ found Dr. Hajjiri's and Dr. Murad's opinions were both inconsistent and not supported, she was not required to provide any further explanation.  20 C.F.R. § 404.1520c(b)(2)-(3); (Tr. 17).  This is because the ALJ's responsibility to provide further explanation of additional factors only arises

25

when multiple opinions are *well-supported* and *consistent*. *See* 20 C.F.R. § 404.1520c(b)(3). No additional articulation requirement is triggered when multiple opinions are *unsupported* and/or *inconsistent*. *See generally* 20 C.F.R. § 404.1520c(b). And this makes sense. When an ALJ concludes that multiple opinions are both consistent and supported, the duty to build an accurate bridge between the evidence and the result would require the ALJ to provide an additional explanation articulating why the ALJ chose to favor limitations from one of the opinions over conflicting limitations in a different opinion. *See* 20 C.F.R. § 404.1520c(b)(3); *cf. Fleischer*, 774 F. Supp. 2d at 877. But, as in this case, when the ALJ has already explained that the opinion at issue was *unsupported* and/or *inconsistent*, she has also satisfied any obligation to explain why any limitations from that opinion were not incorporated into the ultimate RFC finding. *Cf. Fleischer*, 774 F. Supp. 2d at 877.

Substantial evidence also supported the ALJ's conclusion that Dr. Hajjiri's and Dr. Murad's opinions were inconsistent and not well-supported. The ALJ's conclusion that Dr. Hajjiri's and Dr. Murad's opinions were not consistent with Serowski's activities was supported by Serowski's own testimony that the was able to: (1) continue working part-time in a customer service position for which he also lifted items that weighed between 5 and 40 pounds; (2) go up and down the stairs to take care of his grandson; (3) care for 3 dogs; (4) drive without restrictions; and (5) clean his bathroom. (Tr. 38-46, 52-53, 59, 60, 62, 67); 20 C.F.R. § 404.1520c(c)(2). The ALJ's conclusion that Dr. Hajjiri's and Dr. Murad's opinions were not well-supported was supported by such evidence as: (1) treatment notes consistently indicating that Serowski had a regular heart rate and rhythm, clear lungs, normal bowel sounds, and no edema or other issues in his extremities; (2) reports from Serowski that he felt better with treatment, wanted to and did exercise, and was able to wash his car; (3) Dr. Hajjiri's April 2016 decision to clear Serowski for

26

nonstrenuous exercise; (4) the absence of recorded events on Serowski's ICD in March 2016, September 2016, and March 2017; (5) findings that Serowski's medications satisfactorily controlled his blood pressure, heart failure, ventricular tachycardia; (6) normal pulmonary function tests and stress tests; (7) Dr. Muthukrishnan's finding that Serowski had no pulmonary disease to be concerned about; (8) Dr. Ziv's recommendation that Serowski *increase* his activity; and (10) Dr. Tarabici's and Dr. Aleskerov's findings that Serowski had normal EKG results before and after exercise.  (Tr. 309, 311, 315-17, 320, 322, 324, 327, 333-34, 338-39, 353, 355-56, 363, 367, 370, 377, 385, 388, 390, 394-96, 398, 412, 416, 418, 425, 511, 515, 530, 546, 550, 554, 559, 567, 570-71, 575, 673, 675-77, 707, 710, 712, 769, 761, 858, 860, 909-10, 924, 965-67, 1067-68, 1086, 1089, 1116, 1121, 1159); 20 C.F.R. § 404.1520c(c)(1).  Thus, because the ALJ's conclusion that Dr. Hajjiri's and Dr. Murad's opinions were not consistent and not well-supported was reasonably drawn from the record, the ALJ's conclusion fell within the Commissioner's "zone of choice." *Mullen*, 800 F.2d at 545.  And, even if a preponderance of the evidence might have supported a different conclusion, this court is not permitted to second-guess the ALJ's decision when substantial evidence supported it.  *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15; *Jones*, 336 F.3d at 476; *Biestek*, 139 S. Ct. at 1154.

Because the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Dr. Hajjiri's and Dr. Murad's opinions, this court must affirm the ALJ's conclusion that Dr. Hajjiri's and Dr. Murad's opinions were neither consistent with other evidence in the record nor well-supported.

**VI.     Conclusion**

Because the Administrative Law Judge ("ALJ") applied proper legal standards and

reached a decision supported by substantial evidence, the Commissioner's final decision denying

Serowski's application for DIB is AFFIRMED.

**IT IS SO ORDERED.**

Dated: October 30, 2020

Thomas M. Parker
United States Magistrate Judge